Case No. 152011. This was originally before the PTAB in connection with interference proceedings. The challenge to those or the appeal from those interference proceedings was filed originally as a 146 proceeding in district court. The district court has now transferred the case here in light of our Biogen decision. Mr. Reines, you want four minutes for rebuttal? Yes, Your Honor. Let's hope we can give you that. We'll see. Before you begin, can I ask where we are with respect to the transfer question? It seems that you sort of dropped that issue after the Biogen cert petition was denied. Is that off the table now? I think that isn't going to be the subject of oral argument, that's for sure. Okay. I mean, there's nothing we as a panel could have done about it anyway. That's correct, Your Honor. Okay. All right. Go ahead. Thank you, Your Honor. Edward Reines on behalf of Stanford University, may it please the court. The board erred by invalidating Professor Quake and Dr. Christina Phan's patent. The 01 patent captured the inspired insight that Down syndrome, the excessive chromosomes of 21, could be diagnosed without separating fetal DNA from maternal DNA, without separating those two things. For nearly a decade after the discovery that fetal DNA was in the mother's cell-free blood, which we know about from the Lowe case, for nearly a decade, the entire community, including Dr. Lowe, were off chasing an effort to separate fetal DNA to look at it to determine whether the chromosome could be there. Only Professor Quake and Christina Phan's insight that that's foolish. Universities everywhere, companies everywhere, it's documented, it's in this record, were searching for this. And it was foolish because you didn't need to get rid of the maternal background. If you were careful in your molecular counting, you could see the overshoot on the 21 by including it all. And what he then did was he put a patent application together well before anybody else. Let me ask you, I think we're familiar with that, with the history that you're reciting. Let's look at claim one. And this is element B of claim one. And we have conducted massively parallel DNA sequencing of DNA fragments randomly selected. Now, reading that, one would think, well, okay, this claim is directed to a randomly selected process. Then you go to the specification and there's mention there. And I think we're going to get into the value or the weight of that references. But why is there no significant structure that would support a randomly selected? It seems to me that most of the written description goes to targeted selecting and not randomly selected. Okay. Well, first of all, I mean, let me deconstruct one piece of that, which is the vast majority of the specification, the preferred embodiment is digital PCR, which is not sequencing. So if that's what, I'm not sure if that's what you're referring to, that's separate. Then there's a section called sequencing, which starts in column nine, section four. Now, does digital PCR, does that involve both process of randomly selected and targeted? Isn't that mostly directed towards targeted selection? It just has nothing to do with sequencing. It's, you take the DNA and you see which little, you amplify it and then you see which ones light up. I mean, this is the problem with looking at, like, why one would feel the need or urge to import what's happening in digital PCR over to a sequencing disclosure, makes no sense. What I would answer to you, because you asked the question, which really begs the primary question in this appeal, is why is column 19 and 20 sufficient disclosed random sequencing? I think it's relatively simple. I was shocked at the outcome of this. Off-the-shelf technology, at the time that this was submitted, was the Illumina system was a commercial product that was used for random sequencing routinely. No debate in the record. You won't find any debate. Routinely done. Random sequencing, no problem. That's what people do. Their expert, our expert, everybody. The record is also unambiguous, that on the Illumina system, at best, there was some experimental work people were playing with to try and get it to work for targeted sequencing. Keep in mind, targeted sequencing is, just a little bit on the technology, is random sequencing is you sequence everything and then you go figure out which ones of those are going to match to chromosome 21 after the fact. Targeted sequencing is you filter out so that you only have chromosome 21 in whatever control chromosome you're using. You only have those, you sequence those, and you're done. None of this has to do with digital PCR. It's just irrelevant. There's no doubt that the writ description would disclose to one skill in the art that the patent is directed towards targeted sequencing. I don't understand that. It says randomly fragmented genomic DMAs put to a planar surface and then you use the Illumina system. Where are you reading from? This is at column 19, line 61. The point I hear Judge Rayna making is that when you read all of the columns before column 19, the reader is getting conditioned in a very severe way that this patent, this invention is devoted to differential detection of targeted sequencing using something known as digital wells and then you put in your target primer in them to try to figure out a yes-no result for each individual well. It's almost like a jackhammer to your forehead for the first several columns. Then we get to column 19. As I understand the patent board, they're saying these two paragraphs, column 19 and what they're trying to get at. There's a discussion of sequencing, there's discussions of a target-specific sequence, doing massive parallel sequencing on millions of fragments of randomly fragmented genomic DNA, but what we don't know is, is each one of those random fragments getting sequenced or is it possible that there's some kind of target primer being used in this particular section of the patent? I just don't get it. There's no step in here that says you're filtering out all the other chromosomes before you do it. It says you use random sequencing, randomly fragmented genomic DNA, and you use the standard Illumina product. That's what it says in the specification. Within the ordinary skill in the art, they admit that massively parallel sequencing is well known by people with skill in the art. They ended up choosing that one would assume that you would do this targeted on this Illumina platform because of the opposing Dr. Gabriel cited three references that taught targeted sequencing. That's the basis. They said that's the decision point. With respect to those, those all relate to the 454 platform, which is obsolete, never went anywhere. It's not even sold anymore, supported anymore, instead of the wildly popular Illumina system that works on the basic random sequencing. Why would you not use random sequencing? It's within the basic competence in their own statement of ordinary skill in the art that people would be fluent with massively parallel sequencing. It could be that you can use random sequencing within the scope of the process described in the patent. But the question is, is that what the patent discloses? Is that what the patent possesses? Well, it discloses it in the sense that there's no dispute about enablement, nor could there be, because it's agreed that people would know routinely that if you get Illumina, you do random sequencing. That's undisputed. I just don't know how this decision survives that. To go find three articles about a different platform that shows some experimentation with targeted and saying, therefore, we're going to assume there's a step that's not disclosed in this specification that's done beforehand to filter out all the other chromosomes. Why are we working so hard to deprive this person of what he invented? But the question is, did the inventor here really disclose that he, they contemplated using random massive parallel sequencing to detect aneuploidy? And that's less clear here, because there's nothing here that says, we're going to use the Illumina platform, and then we're going to sequence, we're going to use random primers, and we're going to sequence every single little fragment, and then we're going to match up the fragments to the respective chromosomes, and then we're going to count them and associate which chromosomes are bigger than other chromosomes to figure out how many we're going to expect for chromosome 21. But the patent office rules tell you not to put in all that kind of detail when it's so basically known. Literally, in their description of a person of ordinary skill and the art, it states they will be fluent in massively parallel sequencing, and they will know how to take the results of massively parallel sequencing and compare it to a reference genome, which only relates to random parallel sequencing. It doesn't relate to target. So they're saying in the basic competency of a person of skill and the art is random sequencing. You worked in the solicitor's offices, you know, why would you clutter up a patent application with the details when you cite Illumina's product, you've got that as the person of skill and the art? It could be you clutter up a patent because you want to make sure that you're supporting what you claim. I mean, you're claiming something, now we're looking at the written description, we're Understood. That's fair enough. That's fair enough. But I guess the context, Your Honor, is the insight is that you don't worry about the maternal background. Then he has, I think one of the interesting aspects of this is the outline of the section, and he lists detection and quantification, and he lists four different ways of doing it. And one of them is sequencing. So he says one way you do it is sequencing. Let's not deprive him of that. Did he disclose sequencing for this? Yes, he did. Then he discloses the main way you do it is to use an Illumina product whose basic process of use by the undisputed record is random. Then he discloses that if you have 30 base pairs of random sequencing information, you can go to the known genome and figure it out. Why would you disclose that if you were talking about targeted? He cites multiple references on random sequencing, which is known to be basic in the art. How much does he have to do to say sequencing? So, I mean, look, if it was targeted sequencing, someone would come in and say he didn't disclose targeted sequencing. Why are we nitpicking something that's not at the center point of the invention? I just don't understand that. If it wasn't the basic… You're making the claim, not us. The patent is issued, and the burden's on the other side. You're making a claim that the Wren description supports the claim. That's what we're looking at. Fair enough. Call that nitpicking or whatever, but it's your case. True. And what I'm saying is that since it's basic skill in the art to use random sequencing, that's the baseline, and the only evidence in the record is that it's experimental to use targeted sequencing, when the inventor says, oh, and you can use other ways of counting moleculars. I did my work in my university lab with digital PCR. But you know what? It wouldn't be limited to that. It could be emulsion. It could be microfluidic dilution. It could be sequencing. Oh, if you want to do sequencing, use the Illumina. Oh, everyone knows how to use that. It's in the ordinary skill in the art by both parties. Why would that not be covered? It's not that the invention… But Dr. Gabriel said that the Illumina platform could be used either for targeted sequencing or random sequencing. Right. And the state of the record… This, to me, is the hinge point. The state of the record, especially when you go to their opposition, is, well, we kind of agree, because Dr. Detter, who's our expert, said that that would be experimental at the time. And they say, well, he acknowledged that there could be some experimental work that's nonstandard. It's a commercial product with kits sold for random sequencing. There's some experimentation that's been done at that time period on targeted. And the only references that shows anyone ever doing targeted is on this 454 platform, which is not even cited as one of the platforms in here. I understand the reference to the Illumina product, and I believe I understand the Illumina product. What I'm struggling with is whether, in a written description, you can footnote your way around to disclosures. You know, you can bring in material that's not within the four corners of the written description by way of a footnote, and then have us… and try to understand what that footnote means. What's supposed to happen is that you're supposed to have that information in the written description, and that's what we're looking at. Now, you know, I know you're trying to shoehorn the references in here, and I'm trying to find out if your shoehorning is enough or not. You're allowed to incorporate by reference, but the real point, Your Honor, and I understand your frustration with it, and I'm not… But in the statement of the ordinary skill in the art that was included by their expert, it's like seven lines. It's a degree in this and fluency in massively parallel sequencing and knowing how to take the results of that and put that in alignment. So if it wasn't so basic that they have to acknowledge it in their own basic statement of skill in the art, I could see an argument. Wow, that's sort of inventive. It was cutting edge. It was different. Who would know? They're saying people walk into this, the first thing they know is random and parallel sequencing. I should probably sit down. Thank you very much. Yeah, you probably should if you want any time. We'll give you two minutes for rebuttal. Thank you. May it please the Court, I think it would help to focus on the questions from the bench to recognize that there are at least three really profound differences between doing this technique with predetermined unique sequences and doing it by massively parallel random sequencing. And the first is that with a predetermined target, it's easy to detect. The spec says you do it one of two ways. You can have a sequence-specific probe. It says, or you can sequence it, and it's easy to sequence. Counsel, I was really impressed by the credentials of the two experts in this case. And it's clear to me that the POSITA, even though the PTAB didn't go and set out complete detail, but the POSITA in this case is somebody, given the two experts that testified here, they're at a really high level. I mean, they understand DNA technology in the most fundamental way. Why is it that a POSITA looking at the claim and looking at that element B of claim one and then seeing these references that are here, why wouldn't a POSITA say, aha, they've also captured random sequence, random selection? For a couple of reasons. The first is that the fundamental difference between these two methods cascades through the whole method. When you use a predetermined sequence, you fix the ratio for euploidy at one-to-one. You know that there's only going to be one you find in one chromosome and there's only going to be one you find in the other, and you see if the difference is one-to-one. But Dr. Gabriel said that Illumina could be used for targeting sequencing. Absolutely. You don't dispute that at the time that those of skill in the art did not think it was a useful mechanism for targeted sequencing. It was possible they were doing some experimentation, but it wasn't deemed to be efficient. It was deemed to be costly. I mean, isn't it true that Illumina really was an off-the-shelf product for random sequencing? It was, as was the 454 device at the time. And I think it's helpful, if you take a look at page 4887 of the appendix, paragraph 13 of Dr. Gabriel's declaration, she explains what the difference in background is between her and Dr. Duda. Dr. Gabriel is at the Broad Institute at Harvard and MIT, which is one of the biggest human genomic sequences enterprises in the world. And she said that she was deeply involved in human sequencing, including human sequencing with these devices, in 2006 and 2007. But she also said that Quake came up with this targeted fetal DNA sequencing, right? He did indeed come up with the targeted sequencing. And her point is that in human genomic DNA work, these devices were regularly being used for targeted sequencing, not for random sequencing. And that explains the difference in the opinion testimonies. I don't see her saying that Illumina was regularly being used for this. I hear her saying that it was possible. I think if you look at 4890, paragraph 20, I think you'll see at the end of that, she says that she cites the Corecca publication, which, not in the appendix, but when you look at it, you'll see that it was submitted in August 2007 at the end of an obviously lengthy... What volume are we in? I am not sure. It is volume three. Volume three. Volume three. Okay. Okay, go ahead. The Corecca publication actually deals with the Illumina device. The other publications here, essentially contemporaneous with the filing of the application, Bin Laden in 2007, the Dahl publication in 2007. If you look at those in the joint appendix, you'll see that those are in February or were submitted in February, essentially contemporaneous. And then she states, based on her experience with use of these devices for human work, which is what's relevant here, although the publication dates of Corecca and Dr. K are after the filing date of the 686 application, they represent the type of work that was being routinely performed in sequencing laboratories in 2006 and 2007, based on her actual experience with exactly that kind of work. And if I may, the whole point here is no matter what Quake does, Quake has to do a whole bunch of experiments. The only way you get data you can use is by doing a whole bunch of experiments. When you do it with sequence-specific probes, they light up. If you're going to do it by sequencing, you're going to obviously have to do a whole bunch of sequencing, and it sure sounds like a good idea to have a machine. Let's have a machine. And he says there are machines that do a whole bunch of sequencing. He doesn't say use Illumina. He says use a platform based on this kind of machine. And what Dr. Gabriel testified to is that in the human area, because the genome was so big and use of machines was so expensive, they routinely would target the DNA by some kind of target-specific amplification before they put it on the device. And that certainly could have been done. And what the board found, supported by substantial evidence, is that's how a person of ordinary skill in the art would read it. Now, we've heard here, oh, you can just, you know, read into the patent things that the person of ordinary skill in the art might have imagined that you didn't describe, and that's just not the law. The board cited Lockwood v. American Airlines, 107 F3rd 1565 at 1572. The claim was to a whole system. The application was missing pieces of the system. And they said that the person of ordinary skill might speculate as to modifications the inventor didn't disclose doesn't fill the void. Ariad, the Ariad opinion, you know, vague reference and invitation for further research doesn't constitute written description, and went on to say, which is really what they're arguing. They're trying to say, well, somebody skilled in the art might have thought it was obvious from what we disclosed. And Lockwood says that's not enough. Ariad says at 1356 that's not enough. Citing U.C. v. Lilly 119 F3rd at 1566 says that's not enough. The Enzo case makes the point you have to have a description of the whole process. And the court recognized that this difference between using targeted... Is that the case, you have to have a description of the whole product, or you have to have enough description that would lead a procedure to recognize the product? You have to have enough description that would lead a person of ordinary skill in the art to recognize that you were describing that product. Then why, in this situation, going again, and we have two experts that are at a very high level, when they look at the claim and then look at the references in the written description, why is that not enough for an expert to go? I'm assuming, and I think this is a fair assumption, that a POSITA, at the time we're talking about, would understand the difference between targeted and random selection. Absolutely. Why wouldn't a POSITA read this written description in the claim and says, oh look, they're also claiming a random sequencing? At best, they have a suggestion to use one of these massively parallel systems in doing their targeted work. The essence of doing... Well, that's not... I mean, there's more to it. They actually use the word random sequencing more than once, right? Well, no. They say random fragments, and when you make these things, you chop up the DNA, and whether that DNA is something that's been amplified first with target-specific sequences or taken out of the patient, you chop it up and you put it on the device to sequence it. Okay, so your contention is that there's no disclosure of random sequencing at all in the written description. Our position, as ably articulated by Dr. Gabriel, is these devices were known to be useful both ways. And when you read this statement in the context of the entire specification and you see that there's no description of the other steps in the method, no description of mapping the random sequences to the genome, and no description of the fact that the ratio is no longer one-to-one, because when you don't have a preselected sequence, there are different numbers of unique sequences you're going to find depending on the size of the chromosome, and you have to do some fancy statistics to figure that out, and that's nowhere discussed in this. There is no all the rest of the process this deficiency cascades into. This claim, it wasn't filed with the original application, right? Absolutely not. It was filed many years after the original filing date. Indeed. So we can't just look at the claim and say that's its own written description. Absolutely, and in fact, I think we laid out in our brief that the history here objectively supports that this is the kind of case that routinely raises these written description issues. The original application was filed in 2007, described as using known sequences. When Quake finally hit on using random sequencing, so-called shotgun sequencing, filed an entirely separate patent application in September of 2008 in which he referred to this disclosure saying it related to digital PCR, and what happened then? Lowe's competing patent application was published in 2009 showing a priority date before Quake's random sequencing case, and only then, four years, almost four years later, is a claim to random sequencing presented here, and you have to simply work too hard to try to piece this together out of their disclosure, and certainly do not have disclosure of all of the elements or description of all of the elements needed to perform this method. You have the description of all the elements you need if it's targeted. Why? It's a one-to-one ratio if it's targeted. All you need are the simple statistics that he has in the example. You can do the sequencing in a targeted manner, even on these machines, and it all seems to make sense. And candidly, we have a situation where, at best, there are two reasonable conflicting interpretations that could be drawn from the evidence, and in circumstances like that, the Moutet case that we cited in our brief says that's the epitome of substantial evidence, and we submit that the judgment below should be affirmed for that reason. I could go on at length, but I won't. Okay. Thank you. Thank you. In response to Judge O'Malley's question, the answer was yes, kits were standard for random sequencing on off-the-shelf products, and there was experimentation done for targeted sequencing, and then he cites post-filing documents. Those two sites to Illumina are post-filing documents that talk about experimentation with targeted sequencing, which wouldn't have been known by people skilled in the art. What people skilled in the art would know is they could go to Illumina, buy a system, buy kits, and do... And what about the fact that Dr. Gabriel said those post-filing documents are just reflective of what we do pre-filing? I think one thing that this oral argument hasn't focused on sufficiently is the basis for the decision by the board. The board said the reason that they were going with Gabrielson was because of what she said about the 454, which makes no sense because Illumina is what's disclosed. 454 isn't mentioned, and counsel concedes that point. It's directing you to the system that's used for random sequencing. The second point, because there's a little bit of what I would call FUD about one-to-one ratio, that relates to step four. That's the statistical stuff at the bottom, which essentially fell away. It wasn't the basis for the board's decision. The board's decision was that you would think targeted sequencing because there wasn't sufficient detail, because you would look... because he believed... the board believed Gabriel based on the 454 documents. That doesn't make sense. At A2008, there was no kits available for targeted sequencing. So if you went to Illumina, you couldn't even get one. And, you know, I guess the final point I'd like to make on this is, you know, the board's decision is... acknowledges that people skilled in the art would have known random sequencing based on MPS. And I would say to you that if you apply the standard that's being applied, which is every step be spelled out... Is every step for targeted sequencing spelled out on Column 19? Do you see anywhere where they'd say... It says you randomly fragment, which opposing counsel agreed, was you put them all on there, and then it says, and you put them on the device, and then you use the Illumina system. There's no middle step. This is at the bottom of Column 19. There's no step of, okay, now you go filter them out. So it wouldn't be written described for targeted sequencing either, even though this is all just, oh, by the way, another way you can do the molecular counting is off-the-shelf stuff that people know about. That just doesn't make sense. It's almost like, you know, the board was... The board was saying that's the problem. These two paragraphs are ambiguous in isolation. Now you read them in the context of the entire patent. The best reading leans this way rather than that way. The definition of ordinary skill in the art is one of ordinary skill in the art should understand both the operation and application of massively parallel sequencing and have significant direct experience of performing and applying these techniques. Further, one of skill in the art would understand and have experience with techniques for aligning sequencing reads generated by massively parallel sequencing to a reference genome. It's saying in the skill of art is random sequencing. It's disclosed here you use random sequencing. Illumina off-the-shelf is only random sequencing if you're a kid, unless you're experimenting after the filing date. Okay. Your time is up. Thank you.